**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 10-cv-02381-MSK-KLM

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff,

and

MARIA PORTILLO, a/k/a Maria de Jesus Ramirez,

Plaintiff-Intervenor,

v.

THE SPUD SELLER, INC.

Defendant.

---

**PLAINTIFF EEOC'S RESPONSE TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

## INTRODUCTION

Over a period of six years, supervisor Mauricio Gaytan sexually harassed the women employed at Spud Seller's potato farm and processing facility. He cornered them in isolated areas of the facility, groped their breasts, buttocks, and genitals, verbally harassed them, and solicited sex. At least ten women claim Gaytan engaged in such conduct, all telling remarkably similar stories. Some of the women did not complain to Spud Seller management because the women primarily speak Spanish and the managers only speak English. Gaytan, the sexual harasser, was the only bilingual

manager who could act as a liaison between the Spanish-speaking workforce and the English-speaking management. But two women did complain formally to the company: Tina Reyes complained in 2004, and Maria Portillo complained in 2007. Both reported that Gaytan had physically sexually harassed them. Based only on Gaytan's denials, Spud Seller concluded the women were lying, and did nothing to stop Gaytan's sexual harassment. To the contrary, after both complaints, Gaytan continued to supervise the women, and received substantial raises. Genuine issues of fact precluding summary judgment abound in this case. Defendant's motion requires the court to discredit and disregard the testimony of ten women. The Court cannot make the credibility determination Defendant wants, and must deny Defendant's motion in its entirety.

## CLAIMS AND DEFENSES UPON WHICH JUDGMENT IS SOUGHT

Defendant seeks summary judgment on four claims in the following order – (1) the hostile environment claim of Tina Reyes, (2) the hostile environment claim of Maria Portillo, (3) the hostile environment claims of the other aggrieved individuals, and (4) the punitive damages claims of all claimants. Plaintiff will address the third claim first because that claim encompasses the widest array of claimants and facts, and the context of the other claims is more understandable if read in this order.

## I. CLAIM 3: HOSTILE WORK ENVIRONMENT CLAIMS OF AGGRIEVED INDIVIDUALS OTHER THAN REYES AND PORTILLO

### A. Burden of Proof and Elements

The EEOC agrees with Defendant that to establish an actionable hostile work environment, the elements are:

(1) the employee was discriminated against because of her sex; and,

(2) the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment.[1]

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986); *Pinkerton v. Colo. DOT*, 563 F.3d 1052, 1058 (10th Cir. 2009). The EEOC must establish by a preponderance of the evidence that a hostile work environment existed. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003).

Defendant does not contest, for the purposes of its motion, that Gaytan's conduct occurred as alleged [Doc. 42, p.2].[2] Rather, Defendant challenges whether the EEOC has shown sufficient evidence to establish a genuine issue of fact as to whether the Defendant is liable for the sexual harassment of the aggrieved individuals.

While the EEOC agrees with Defendant's recitation of the elements of a hostile work environment, the EEOC strongly disagrees with Defendant's analysis of employer liability. The Defendant conflates the distinct frameworks for direct and vicarious liability,

---

[1] Defendant insinuates that the inquiry into severe or pervasive is separate from that of an abusive working environment, when these are actually one inquiry under *Meritor*.

[2] In footnote 8 of its Motion, Defendant states that April Cordova's claim fails because Gaytan's actions against Cordova were not "imbued with sexual overtones." Whether Gaytan's conduct was "imbued with sexual overtones" is not the inquiry. The proper question is whether Gaytan subjected Cordova to a hostile work environment because of her sex. Sexual harassment does not have to be motivated by sexual impulse. *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir. 1991) "We have never held that sexual harassment…must, to be illegal under Title VII, take the form of sexual advances or of other instances with clearly sexual overtones" *Id.* (*quoting McKinney v. Dole*, 246 U.S. App. D.C. 376 (D.C. Cir. 1985)).

Gaytan's conduct must be examined in context. "By parsing out the various instances of harassment and characterizing them as gender-neutral, or not pervasive, [the employer] seeks to eschew the proper "totality of the circumstances" test, which is the "touchstone" of our analysis of hostile work environment claims. … a sexual harassment case should not "examine each alleged incident of harassment in a vacuum because w]hat may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other related incidents." *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 799 (10th Cir. 2007)(internal citations omitted); *see Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415-17 (10th Cir. 1987)(acts not overtly sexual, and incidents of sexual harassment directed at others should be considered). Cordova was subjected to unwanted touching and frequently humiliated by Gaytan following her and waiting for her at the women's restroom, while men were not subjected to similar degrading treatment.

and erroneously relies on the elements and jurisprudence of each indistinguishably. Defendant is liable under either framework for the hostile work environment at Spud Seller, but each must be analyzed separately.

When a coworker is the harasser, liability is available only under a negligence theory. *Rahn v. Junction City Foundry*, 152 F.Supp.2d 1249, 1259 (D. Kan. 2001). Where the harasser is a supervisor, however, there are two theories of liability available – both negligence and vicarious liability. *Burlington Indus. v. Ellerth*, 524 U.S. 742, 758-59 (1998); *Helm v. Kansas*, 656 F.3d 1277, 1284 (10th Cir. 2011). "[A]lthough a supervisor's sexual harassment is outside the scope of employment because the conduct was for personal motives, an employer can be liable, nonetheless, where its own negligence is a cause of the harassment. An employer is negligent with respect to sexual harassment if it knew of should have known about the conduct and failed to stop it. Negligence sets a minimum standard for employer liability under Title VII. . . ." *Ellerth,* 524 U.S. at 758-759.

In addition to its recognition of employer liability for negligence, the *Ellerth* Court provided an alternative and "more stringent" standard under agency principles. Thus, in addition to negligence, an employer may be vicariously liable for its supervisor's conduct, based on the supervisor's misuse of delegated authority under agency principles. *Burlington,* 524 U.S. at 759-760.

Negligence and vicarious liability entail different analyses.[3] Following *Ellerth,* the Tenth Circuit has explained that the negligence theory of employer liability is available for a hostile work environment created by ***any*** employee. *Baty v. Willamette Indus.*, 172 F.3d 1232, 1241-42 (10th Cir. 1999). When a supervisor creates the hostile work environment, the additional standard of vicarious liability is available, and it is only this standard that is subject to the *Faragher/Ellerth* affirmative defense -- that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and the employee failed to take advantage of corrective or preventive opportunities. *Id.* at 1242; see also *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 951-52 (7th Cir. 2007) (*Faragher/Ellerth* not available for negligence); *Henderson v. Montgomery County*, 213 F. Supp. 2d 1262, *n.13 (D. Kan. 2002) (same); *Wilson v. Tulsa Junior College*, 164 F.3d 534, n.4 (10th Cir. 1998) (explaining differences between vicarious and negligence liability).

**1. Employer Liability for Negligence**

Negligence liability is not derivative, but inheres from the employer's own personal culpability for failing to act appropriately in the face of sexual harassment of which it knew or should have known. *Adler v. Wal-Mart Stores*, 144 F.3d 664, 673 (10th Cir. 1998). In the Tenth Circuit, a plaintiff must prove that (1) the employer had actual or constructive knowledge of the hostile work environment, and (2) the employer did not adequately respond to notice of the harassment. *Adler v. Wal-Mart Stores, Inc.*, 144 F.

[3] Defendant erroneously interchanges the standards and case law from the different frameworks. *Cf. Helm v. Kansas*, 655 F. 3d 1277, 1289 (10th Cir. 2011) (test for vicarious liability); *Swenson v. Potter*, 271 F.3d at 1191-92 (same) and *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 952-53 (7th Cir. 2007) (applying vicarious liability to the case), *with Adler v. Wal-Mart Stores*, *Inc.*, 144 F. 3d 664, 676 (10th Cir. 1998) (test for negligence liability); *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1139-40 (10th Cir. 2008) (same).

3d at 673; *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007); *Hirschfeld v. New Mexico Corrections Dep't*, 916 F.2d 572, 577 (10th Cir. 1990); *see also Dunn v. Wash. County Hosp*., 429 F.3d 689, 691 (7th Cir. 2005).

A defendant has actual knowledge of a hostile work environment upon receipt of a complaint from an employee. *Adler v. Wal-Mart Stores, Inc.*, 144 F. 3d at 673. Constructive knowledge is imputed to the employer when the workplace is so permeated with sexual harassment that its managers would be expected, in the exercise of reasonable care, to discover it. *Id.*; see also, e.g., *Hirase-Doi v. U.S. West Communs*, *Inc.*, 61 F. 3d 777, 784 (10th Cir. 1995) (genuine issue of fact remained where 8-10 victims put the employer on constructive notice).

Whether the employer maintains a sexual harassment policy has little relevance for the purposes of ascertaining liability in negligence.[4] *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 951-52 (7th Cir. 2007) (*Faragher/Ellerth* defense not available); *Henderson v. Montgomery County*, 213 F. Supp. 2d 1262, *n.13 (D. Kan. 2002) (same). Rather, the focus of the negligence inquiry is on the adequacy of the employer's response when it learned of the harassment, and whether the employer's response was "reasonably calculated to end the harassment." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d at 676.

Evidence that other employees were harassed by the same culpable agent even

[4] The existence of a policy speaks to satisfaction of the prevention aspect of the first prong of the *Faragher/Ellerth* affirmative defense, which arises only in the context of the vicarious liability analysis. *Ellerth,* 524 U.S. at 759-762. Defendant misappropriates jurisprudence from the *Faragher/Ellerth* analysis when it states, "[e]mployers have been found to have acted reasonably as a matter of law when they adopted valid sexual harassment policies, [and] distributed these policies to employees via employee handbooks." Deft. Brief at 4 (Doc. 42. Moreover, the first prong of the *Faragher/Ellerth* defense requires the defendant to establish that it took reasonable measures to both prevent ***and*** promptly correct any harassment. *Id.* at 765. The existence of appropriate policies may be evidence of reasonable measures to prevent harassment, but do not establish reasonable measures to promptly correct any harassment.

after the employer received notice constitutes evidence of inadequate response. See *Miller v. Regents of the Univ. of Colo.*, 1999 U.S. App. LEXIS 16712, *37-39 (10th Cir. July 19, 1999); see also *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 111 (3d. Cir. 1998); *Jonasson v. Lutheran Child & Family Servs*., 115 F.3d 436, 439 (7th Cir. 1997). In such cases, courts consider the "timeliness of the plaintiff's complaint, whether the employer unduly delayed, and whether the response was proportional to the seriousness and frequency of the harassment." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d at 676. Adequacy of the employer's response is scrutinized under the "totality of the circumstances," and as such, no one effort necessarily controls. See *Wilson v. Tulsa Junior College*, 164 F.3d 534, 537-40, 542-43 (10th Cir. 1998)(response found inadequate where supervisor exposed himself and was subsequently suspended, and separated from victim upon his return); *Hansel v. Public Service Co.*, 778 F. Supp. 1126, 1132 (D. Colo. 1991) (where the harassment ended but the harasser was not disciplined, the remedial efforts were inadequate); *Jacob v. ES-O-EN Corp.*, 2008 U.S. Dist. LEXIS 12742, *20-21 (D. Utah 2008) (citing negligence case law to support punitive damages where harasser was separated from victim, but not disciplined adequately); see generally *Fuller v. City of Oakland*, 47 F.3d 1522, 1528-29 (9th Cir. 1995) (harasser voluntarily stopping harassment does not absolve employer from responsibility to act; investigation does not suffice). Whether the employer's response is proportional to the seriousness of the harassment is a relevant factor to consider in determining whether the response was adequate. *Wilson v. Tulsa Junior College*, 164 F.3d 534, 543 (10th Cir. 1998). Advising or reminding the harasser of the company's

policy against discrimination generally does not suffice. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d at 676; *护Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1148; *see, e.g., MacGregor v. Mallinckrodt, Inc.*, 373 F. 3d 923, 931 (8th Cir. 2004).

Defendant seeks summary judgment only under the *Faragher/Ellerth* defense on the claims of the aggrieved individuals represented by the EEOC, other than Tina Reyes and Maria Portillo. Doc. 42 at 16-20. Because that defense applies only to the vicarious liability analysis, Defendant has not sought summary judgment on the negligence claims of those aggrieved individuals. Accordingly, in the "Elements Challenged by Defendant" portion of this section, we address only the vicarious liability theory.

**2. Vicarious Liability**

Under the vicarious liability theory, the employer is liable for the misdeeds of its agent under common law agency principles. *Burlington Indus. v. Ellerth*, 524 U.S. 742, 764-65 (1998). The theory arises out of the supposition that an agent benefits from, and is aided by, the authoritative powers he enjoys over his subordinates. *Burlington Indus. v. Ellerth*, 524 U.S. 742, 758-59 (1998). When a supervisor is the source of the hostile work environment, the employer is *presumed* to be liable unless (1) there has been no tangible employment action, and (2) the employer can satisfy the affirmative defense enunciated by the Supreme Court in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998). To satisfy the *Faragher/Ellerth* affirmative defense, the defendant has the burden to establish that (1) the employer exercised reasonable care to prevent and correct promptly any sexually

harassing behavior, and (2) the employee unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer or to avoid harm otherwise.[5] *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765. Although Defendant has correctly articulated the two elements of the *Faragher/Ellerth* affirmative defense, it has failed to fully articulate the legal standards for aggrieved individuals who do not report victimization in a class harassment setting. Defendant improperly emphasizes only the second element of the affirmative defense, ignoring evidence which defeats its ability to establish the first element. Defendant must prove both elements, so that any individual claim is not necessarily defeated by a woman's failure to report sexual harassment.

The first prong of the defense requires the employer to prove both that it exercised reasonable care to ***prevent*** sexual harassment, and also that it ***corrected promptly*** any sexual harassment that occurred. *Helm v. Kansas*, 656 F. 3d at 1288-90. A sexual harassment policy cannot be only on paper; an employer must also show that it was effectively enforced, in order to prove the employer took reasonable preventative measures. *See, e.g., Hurley v. Atlantic City Police Dep't*, 174 F. 3d 95, 111, 118 (3d. Cir. 199); *BreMiller v. Cleveland*, 195 F.R.D. 1, 31 (N.D. Oh. 2000). "[A]n employer's mere promulgation and dissemination of an adequate sexual harassment policy does not, by itself, establish that the employer acted reasonably to remedy any harassment that occurred despite the reasonable preventative measures." *Helm v. Kansas*, 656

[5] The second prong of *Faragher/Ellerth* is not in question for the claims of Maria Portillo and Tina Reyes because both formally complained to Spud Seller management about being sexually assaulted by Mauricio Gaytan.

F.3d at 1290; *Anderson v. Wintco, Inc.*, 314 Fed. Appx. 135, 139 (10th Cir. 2009). See also *Pinkerton v. Colo. DOT*, 563 F.3d 1052, 1062 (10th Cir. 2009) (Even where a policy, training, and widespread distribution have occurred, those efforts may not constitute reasonable preventative measures, and the inquiry into corrective measures remains).

Corrective measures are not reasonable unless they are proportional and reasonably calculated both to end the instant harassment and to prevent future similar misconduct. *Scarberry v. ExxonMobil Oil Corp.*, 328 F.3d 1255, 1259-60 (10th Cir. 2003); see also *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 875-77 (9th Cir. 2001). "Repeat conduct may show the unreasonableness of prior responses. . . . To be reasonable, responses must progress more rapidly in proportion to more serious and frequent harassment." *Adler v. Wal-Mart Stores,* 144 F.3d at 676. The focus is not hermetically on the defendant's corrective actions, divorced from context. A reasonable corrective measure should respond to the totality of the circumstances. *See Miller v. Regents of the Univ. of Colo.*, 1999 U.S. App. LEXIS 16712, *39 (10th Cir. 1999) (harassment of other employees relevant); *BreMiller v. Cleveland Psychiatric Inst.*, 195 F.R.D. 1, *30-*31 (N.D. Oh. 2000) (widespread hostile work environment requires more than situation-specific responses). An employer's response must put the perpetrator on notice that future misconduct will not be tolerated, and must aim to deter other potential harassers from engaging in similar misconduct. See *MacGregor v. Mallinckrodt, Inc.*,

373 F.3d 923, 931 (10th Cir. 2004); see generally *Fuller v. City of Oakland*, 47 F.3d 1522, 1528-29 (9th Cir. 1995).[6]

**B. Elements Challenged by Defendant**

**1. Vicarious Liability – *Faragher/Ellerth* Affirmative Defense**

**Element 1: Defendant cannot show that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior.**

(1) After Tina Reyes reported in June 2004 that she had been sexually harassed by Mauricio Gaytan, Mr. Gaytan was neither disciplined nor demoted, was not required to undergo additional sexual harassment training, and received a substantial raise the following year. Ex. 33, at EEOC 00244; D. Hazard Dep. 88:7-89:12, 160:23-161:2; Gaytan Dep. 166:7-21; 129:14-130:18.

(2) Ms. Reyes was later disciplined for discussing her allegations with coworkers. Ex. 34, at EEOC 00271; Ex. 35.

(3) Class victim Leanda Michelle Villalba worked for Defendant between October 31, 2005 and October 22, 2008. Ex. 36, at EEOC 00232.

(4) In late 2005, Mauricio Gaytan repeatedly showed to Leana Michelle Villalba pictures on his phone of cartoon characters having sex. Villalba Dep. 29:19-31:18. He repeatedly subjected her to sexual gestures,

[6] Though *Fuller* implicates a negligence analysis, the distinction the court makes is apt: "As the [defendant] sees it, because the harassment stopped, its response was *ipso facto* reasonable…However, this analysis omits a critical step. The fact that harassment stops is only a test for measuring the *efficacy* of a remedy, not a way of excusing the *obligation* to remedy…Effectiveness will be measured by the twin purposes of ending the current harassment and deterring future harassment - by the same offender or others." 47 F.3d 1522, 1528.

pretended to “hump” her and rub her breasts and buttocks, and brushed up against her with an erection. Villalba Dep. 33:20-36:22, 40:14-46:18.

(5) Ms. Villalba reported Gaytan’s inappropriate behavior to Dan Hazard on three different occasions. Villalba Dep. 66:2-73:17.

(6) Class victim Mary Atencio worked for Defendant between October 30, 1989 and July 29, 2008. Ex. 36, at EEOC 00227.

(7) In 2006, Gaytan sexually harassed Mary Atencio by talking about how well she could masturbate him, how he liked to take women from behind, and that he ate his wife out every night. Atencio Dep. 25:11-27:6, 31:24-32:19, 36:3-25.

(8) April Cordova worked for Defendant between April 8, 2005 and March 17, 2006. Ex. 36, at EEOC 00227.

(9) About three to four months before April Cordova was terminated in March 2006 (i.e. late 2005 and early 2006), Mauricio Gaytan began following April Cordova to the women’s restroom and timing her, then criticizing her for taking too long. He also brushed up against her while she worked. Cordova Dep. 22:22 -24:25, 27:4-16. Mr. Gaytan did not similarly follow male employees to the restroom. Cordova Dep. 24:16-21.

(10) Dreamisha Guerrero worked for Defendant between July 16, 2007 and August 31, 2007. Ex. 36, at EEOC 00229.

(11) After working for only six weeks for Spud Seller in July and August of 2007, Dreamisha Guerrero resigned because Mauricio Gaytan was staring at her breasts and grabbed her butt. Guerrero Dep. 36:24-40:14.

(12) When Ms. Guerrero quit on August 31, 2007, she told Dan Hazard that it was because she felt very uncomfortable working around the men, and felt she was being looked at and treated as a sex symbol. Guerrero Dep. 42:5-43:7.

(13) Shane Gomez worked for Defendant periodically in 2007, 2009, 2010, and 2011. Ex. 37; Ex. 38; Ex. 39; Ex. 40.

(14) Shortly after Shane Gomez was hired in 2007, Mauricio Gaytan repeatedly made comments like “Your ass looks good,” and “Shake your ass more.” Gomez Dep. 32:9-25, 33:12-34:2. He later speculated about how her body would look if he was having sex with her, told her dirty jokes, grabbed his penis and asked her is she “wanted some,” and called her cell phone asking her out. Gomez Dep. 38:17-40:1, 41:8-42:11, 43:17-44:10, 46:5-47:20, 49:25-51:24.

(15) In December of 2007, Maria Portillo was sexually assaulted by Mr. Gaytan. This sexual assault was preceded by months of Mr. Gaytan making offensive sexual comments and gestures. For example, Mauricio Gaytan harassed Portillo by commenting on her buttocks (”ass”), informing her of his erections, and making sexual lip-licking gestures at her. Portillo Dep. 45:4-47:12. He subjected Portillo to a stream of commentary about other

women's bodies, and expressed the desire to 'eat them out.' Portillo Dep. 45:4-47:12. These vulgarities occurred almost every day. Portillo Dep. 54:18-55:10. After Gaytan assaulted her, Ms. Portillo reported the incident to Defendant.

(16) Maria Portillo reported Gaytan's sexual harassment to Defendant in December of 2007, but Mauricio Gaytan was neither disciplined nor demoted, was not required to undergo additional sexual harassment training, and received a pay increase the following year. D. Hazard Dep. 88:7-89:1; Gaytan Dep. 166:19-21, 129:14-130:18; Ex. 41; Ex. 42.

(17) On June 10, 2008, Ms. Portillo filed a charge of discrimination with the EEOC, alleging sexual harassment by Mr. Gaytan. Ex. 43, at EEOC 00097.

(18) Shanan Cisneros worked for Defendant between April 22, 2007 and October 8, 2009. Ex. 44; Ex. 45.

(19) In April of 2009, on the same day that Shanan Cisneros was hired as a sorter, Gaytan promoted her into a higher-paying ticket-writing job, and two of the older women employees told her to watch out. Cisneros Dep. 29:5-31:3. Gaytan came into the ticket office often and told Ms. Cisneros she looked good, had a big butt, and had big boobs, and Gaytan also grabbed her buttocks and breasts. Cisneros Dep. 31:20-51:4.

(20) Shortly before Shanan Cisneros left her job in October of 2009, Mr. Gaytan grabbed her buttocks as she walked to the bathroom. She called

him a pig, told him not to touch her, and then immediately went to Dan Hazard and reported the conduct, telling Mr. Hazard she would throw Gaytan "into the machine" if he touched her buttocks one more time. Cisneros Dep. 38:1-40:24. Defendant took no action in response to Ms. Cisneros' complaint.

(21) After October of 2009, when Shanan Cisneros had left Spud Seller and was desperate for employment, Mauricio Gaytan promised to get her job back if she had sex with him. Cisneros Dep. 51:9-59:21, 63:6-64:19.

(22) Class victim Leticia Salazar worked for Defendant Spud Seller between December 3, 2008 and August 5, 2009. Ex. 36, at EEOC 00231; Ex. 46.

(23) In March and April of 2009, Mr. Gaytan grabbed Leticia Salazar from behind by the waist when she was bent over, traced his fingers up and down her back, speculated about how her vagina ("pussy") looked, and asked her to "suck his dick." Salazar Dep. 27:16-31:8.

(24) Ms. Salazar did not report Mr. Gaytan's conduct to management because "I've heard that the other girls, when they were saying that Mauricio was going to court because he did the same to that—that other girl, I said that I felt like if I said something, they wasn't going to listen; because they still had him working there knowing what he had did. So it was going to do me no good." Salazar Dep. 110:9-18.

(25) Joni Mae Marquez worked for Defendant between December 21, 2009 and February 22, 2010. Ex. 47; Ex. 48.

(26) Shortly after Joni Marquez began working for Spud Seller in December 2009, Mauricio Gaytan rubbed Joni Mae Marquez's stomach, and followed her into the bathroom. Marquez Dep. 47:12-50:5, 53:10-54:12, 124:4-125:7.

(27) After a maternity leave in early 2010, Ms. Marquez returned in April. Mr. Gaytan assigned her to work as a porter, and put his hands on her back and waist as she bent over to clean the cleaning closet. Marquez Dep. 58:22-60:11, 63:21-23. Later, as she was cleaning the men's bathroom, Mr. Gaytan entered and closed the door, and did not respond when she asked why he had closed it. She became uncomfortable and left, and asked to be relieved of bathroom-cleaning duty. Marquez Dep. 50:6-52:15, 54:3-12. About a week later, she was working at a sorting table when Mr. Gaytan motioned toward her to follow him, and she did. He led her to the bathroom, where he stood in the bathroom doorway with one hand on his belt and the other leaning against the doorway, and said, "Come into the bathroom, I'm alone." Ms. Marquez immediately walked off the job and did not return. Marquez Dep. 76:3-82:5, 83:7-84:22.

(28) Between 2004 and 2010, Mauricio Gaytan supervised all the warehouse personnel, including each of the ten women for whom EEOC seeks relief. D. Hazard Dep. 21:10-21; Gaytan Dep. 24:22-25; Ex. 49; Guerrero Dep. 30:19-31:2; Marquez Dep. 30:18-22; Portillo Dep. 26:13-18; Atencio Dep.

81:24-82:4; Cisneros Dep. 27:18-28:6; Salazar Dep. 20:3-5; Cordova Dep. 20:9-13; Gomez Dep. 31:16-32:2; Villalba Dep. 23:3-6.

Although Defendant may have distributed a sexual harassment policy, it did not actually enforce the policy. When women followed the policy and complained about Gaytan's sexual harassment, Spud Seller did nothing to stop the harassment. Quite the contrary, in 2004 when Spud Seller was first put on notice that Gaytan had exposed his penis to one of his female subordinates, Spud Seller failed to adequately investigate or respond. No other women were questioned to see if they had seen or experienced sexual harassment. No prophylactic measures were taken – no additional training, counseling, warnings, or monitoring were imposed on Gaytan to ensure that, if the allegations were true, he did not repeat the conduct. As a result, Mr. Gaytan continued to sexually harass his subordinate employees without consequence.

Had Spud Seller acted responsibly after Ms. Reyes' complaint in 2004, there would be no other victims. In the years following Reyes' complaint, when other women came with similar allegations against Gaytan, Spud Seller again failed to investigate adequately and failed to take any action against Gaytan. Gaytan was never disciplined or counseled or required to undergo any training whatsoever. To the contrary, Defendant rewarded Gaytan with pay increases, thereby fostering his conduct.

Thus, Defendant's emphasis on the second element of the affirmative defense is of no consequence, because it must establish both elements and cannot establish

the first – that it acted reasonably to promptly correct sexual harassment. Accordingly, the defense fails and Defendant's motion must be denied.

**Element 2: The employees unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer or to avoid harm otherwise.**

(29) Plaintiff incorporates from the preceding section paragraphs 1, 2, 5, 12, 16, 17, and 20, which demonstrate that four women complained specifically about Gaytan's harassment over the period from 2004 to 2007, and another woman reported that she was resigning because of the men staring at her and treating her like a "sex symbol."

(30) Although four different women complained to Spud Seller about Gaytan's sexual harassment, he did not receive a single warning or discipline for sexual improprieties in his employment with Spud Seller. D. Hazard Dep. 88:7-89:12, 160:23-161:2; Gaytan Dep. 166:19-21; 129:14-130:18.

(31) Despite the repeated complaints, the physically threatening conduct that the victims complained of, and the open and widespread harassment by Mr. Gaytan, and the filing of an EEOC charge because of Mr. Gaytan's sexual harassment, Mr. Gaytan continued to supervise the women, and continued to receive annual raises. Gaytan Dep. 166:19-21; 129:14-130:18; Ex. 43, at EEOC 00097; Ex. 41; Ex. 42; Ex. 50; Ex. 33; Ex. 51.

(32) Because Leticia Salazar knew that others had complained of Gaytan's behavior and that legal action had been taken, but Gaytan was still supervising and continuing to harass, she did not report Gaytan's sexual

harassment because reporting it "was going to do me no good." Salazar Dep. 110:9-18.

The fact that Mr. Gaytan went unpunished for at least six years after Defendant became aware of a complaint, and continued to receive raises, demonstrates that Defendant did not exercise reasonable care to prevent and correct harassment. The policy was ineffective, and the message sent to other victims of Gaytan's harassment (like Ms. Salazar) was that complaining was pointless because Spud Seller's inaction essentially condoned the conduct. Therefore, a jury could reasonably find that the failure of some of the women to report Gaytan's conduct was not unreasonable, and Defendant has not met its burden on the second element of the affirmative defense.

## II. CLAIM 1: TINA REYES SEXUAL HARASSMENT CLAIM

### A. Burden of proof and elements

Tina Reyes' sexual harassment claim is analyzed under the same elements as set out above in Section IA, relating to the sexual harassment claims of all the aggrieved individuals. Therefore, Plaintiff incorporates by reference the legal analysis set out in Section IA above, both as to liability for negligence and vicarious liability.

### B. Elements Challenged by Defendant

Defendant asserts only that Plaintiff cannot establish employer liability, and does *not* challenge Ms. Reyes' hostile environment claim. Doc. 42, p. 5 (only element challenged is employer liability). Defendant has, however, conflated the two theories of employer liability – negligence and vicarious liability. Because Defendant did not

distinguish between the two standards and set out the elements of each, Plaintiff includes facts establishing the elements for each theory separately.

**1. Employer Liability – Negligence**

**Negligence Element 1: The employer had actual or constructive knowledge of the hostile work environment.**

(1) On June 3, 2004, Tina Reyes reported to Warehouse Manager Dan Hazard that Mauricio Gaytan had exposed himself to her the day before, while she was alone at work. Reyes Dep. 81:18-85:24, 94:5-20; D. Hazard Dep., 146:24-148:14; Ex. 52.

**Negligence Element 2: Defendant did not adequately respond to notice of the harassment.**

(2) During the meeting held to address Ms. Reyes' complaint, the focus of the conversation evolved from Reyes' allegation of sexual harassment to the work history she and Gaytan had previously – specifically that, on several occasions when her back was in pain, she asked him to "pop" her back for her. D. Hazard Dep. 150:2-9, 152:10-154:13.

(3) There was nothing sexual about Reyes' request for assistance popping her back. D. Hazard Dep. 152:10-153:17; Gaytan Dep., 45:3-11; J. Hazard Dep. 146:10-23, 148:4 -149:9.

(4) Tina Reyes and Mauricio Gaytan were never romantically involved with each other and there was no reason to think that they had been. D. Hazard Dep. 149:12, 159:9-16.

(5) There were no problems between Mauricio Gaytan and Tina Reyes other than Reyes' complaint of sexual harassment. Gaytan Dep. 36:2-37:6, 38:8-24, 40:11-13, 45:14-24.

(6) At the conclusion of the June 3, 2004 meeting, with no further investigation, Dan and Jennie Hazard determined that there was no evidence to support Reyes' claims. They did not attempt to locate or identify potential witnesses, or canvass other female employees to see if they had experienced similar treatment. D. Hazard Dep. 160:23-161:2 (no other action taken); Ex. 52; J. Hazard Dep. 149:23–150:15.

(7) At the conclusion of the June 3, 2004 meeting, Dan Hazard threatened *both* Tina Reyes and Mauricio Gaytan with termination if he witnessed unprofessional conduct between the two. The admonishment related to behavior such as back-popping, and was not related to the allegations made by Reyes of sexual harassment that had originally inspired the meeting. D. Hazard Dep. 149:12-24, 154:17-155:3; Ex. 52; J. Hazard Dep. 150:2-15.

(8) Mauricio Gaytan was not required to attend additional training on sexual harassment. Mauricio Gaytan watched only one video clip regarding sexual harassment in his entire tenure with Spud Seller, which he watched at the time he was first hired in 2001. Gaytan Dep. 164:16-21, 166:7-18.

(9) Mauricio Gaytan did not receive a single oral or written warning for sexual misconduct during his entire tenure with Spud Seller. D. Hazard Dep. 88:7-89:12, 160:23-161:2; Gaytan Dep. 166:19-21; 129:14-130:18.

(10) Before the meeting, Mauricio Gaytan supervised all of the warehouse personnel with the exception of managers Dan and Jennie Hazard, and owner Lynn McCullough. D. Hazard Dep. 20:25-21:21; Gaytan Dep. 9:6-10:24.

(11) After Reyes' accusation, Mauricio Gaytan remained in his supervisory position for six more years, until September of 2010. At that time, he was removed from his supervisory job due to reorganization of the warehouse and changes in technology. He continued to receive the same base salary until June 30, 2011. D. Hazard Dep. 28:14-29:20; Gaytan Dep. 25:4-19.

(12) Mauricio Gaytan continued to be designated as one of the three management employees who workers should approach with a complaint about sexual harassment. Ex. 53, at SS 0003; Ex. 54, at SS 0206; Cisneros Dep. 97:8-98:19; Salazar Dep. 61:11-63:2.

(13) Mauricio Gaytan received positive evaluations and substantial raises, among other benefits, each year from 2004 through 2009 (from $39,000 in 2004 to $40,950.00 in 2005), $45,950.00 (2006), $52,000.00 (2007), $56,950.00 (2008), and $62,360.25 (2009)). In 2010, there was a pay freeze, but Gaytan received a good evaluation for 2010 and his salary

remained the same. D. Hazard Dep. 27:12-20; Gaytan Dep. 24:14-19; Ex. 51, at EEOC 00246 (2004); Ex. 33, at EEOC 00244 (2005); Ex. 50, at EEOC 00242 (2006); Ex. 42, at EEOC 00239 (2007); Ex. 41, at EEOC 00236 (2008); Ex. 55, at SS 0651 (2009); Ex. 56, at SS 0653 (2010).

(14) Jennie and Dan Hazard did not believe Tina Reyes' accusation of sexual harassment. Ex. 57; J. Hazard Dep. 208:13-20.

(15) On June 9, 2004 Tina Reyes was still, at least in part, under Mr. Gaytan's supervision, even after she complained. Ex. 58.

(16) On January 24, 2005 an employee complained to Dan Hazard that Tina Reyes was talking with coworkers about Mauricio Gaytan exposing himself. Ex. 34; J. Hazard Dep. 157:18-158:20.

(17) One day later, on January 25, 2005, Jennie Hazard called Mountain States Employers Council to seek legal advice on how to discipline and/or begin the process of terminating Tina Reyes. Ex. 34; J. Hazard Dep. 158:25-159:21.

(18) Later that day, on January 25, 2005 Dan Hazard issued Reyes a written warning for discussing her sexual harassment allegations with coworkers. Mr. Hazard did not investigate the employee's complaint, or provide Ms. Reyes with the opportunity to explain or rebut it before he issued the warning. Ex. 34; Ex. 35; D. Hazard Dep. 170:7-171:19; J. Hazard Dep. 158:3-160:15.

Defendant's response to Reyes' sexual harassment complaint consisted of a meeting that lasted about one hour. Spud Seller can point to no corrective action it took -- it is undisputed that the threat of termination referred to in Defendant's Motion for Summary Judgment is not related to sexual harassment, and equally applied to both Reyes and Gaytan. Mauricio Gaytan was not reprimanded, suspended, terminated, or warned that similar conduct would warrant progressive discipline. He was not required to undergo additional sexual harassment training. He remained a supervisor without restriction until September of 2010. Conversely, Tina Reyes was branded as dishonest, and Dan and Jennie Hazard sought to discharge her, issuing her a written warning for discussing the sexual harassment with coworkers. <u>*See*</u> *Ogden v. Wax Works, Inc.*, 214 F. 3d 999 at 1007 (8th Cir. 1999) (investigation was cursory because it focused more on the victim's behavior than perpetrator's). Defendant contends that the harassment ceased because Gaytan never exposed his penis to Reyes again. In truth, however, Gaytan's sexual harassment did not stop. As described more fully in Section I above, the Commission has identified at least nine other women subjected to Gaytan's continued sexual harassment, including Maria Portillo. The testimony of these women is substantial evidence that after the meeting regarding Ms. Reyes' complaint, Mauricio Gaytan did not stop sexually harassing his subordinate female employees. <u>*See*</u> *Miller v. Regents of the Univ. of Colo.*, 1999 U.S. App. LEXIS 16712, at *38 (subsequent victims manifest negligence); *Jonasson v. Lutheran Child & Family Servs*., 115 F.3d 436, 439 (7th Cir. 1997) (perpetrator's continuing harassment of other food service employees supports negligence finding). Spud Seller's response to Reyes' complaint

communicated to its workforce that Gaytan's sexual harassment was tolerated, thereby discouraging his other victims from reporting Gaytan's subsequent harassment. See *MacGregor v. Mallinckrodt, Inc.* 373 F. 3d at 931) (failure to communicate investigation results to complainants may discourage victims from making additional complaints).

The hostile work environment analysis must be based on the workplace culture as a whole. *See EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 799 (10th Cir. 2007)(internal citations omitted); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415-17 (10th Cir. 1987). Mr. Gaytan continued to harass numerous victims with impunity for at least another five years. Against this backdrop, a reasonable jury has ample evidence to conclude that Spud Seller did not adequately respond to Ms. Reyes' notice of the harassment, such that Spud Seller was negligent and therefore liable for the injuries suffered by Reyes.

**2. Employer Liability -- Vicarious Liability**

Assuming for purposes of this Motion that Ms. Reyes suffered no tangible employment action, Defendant still cannot meet its burden of proving both elements of the *Faragher/Ellerth* affirmative defense – (1) that Defendant exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that Ms. Reyes unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer, or to avoid harm otherwise. Defendant is required to prove both elements, but can prove neither.

**Vicarious Liability, Element 1 – Defendant cannot prove that it acted reasonably to prevent and promptly correct the sexual harassment.**

(1). Plaintiff incorporates by reference the allegations of Paragraphs 2-13 of the facts set out in the immediately preceding section on negligence.

Although fact issues remain as to whether the issuance of a sexual harassment policy was an adequate preventive effort, even assuming for purposes of this motion that there were none, these facts demonstrate genuine issues of material fact as to the adequacy of Defendant's corrective actions. Defendant's response to Ms. Reyes' complaint was insufficient to establish the second prong of the affirmative defense.

**Vicarious Liability, Element 2 – Defendant cannot prove that Ms. Reyes unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer or to avoid harm otherwise.**

(1). Plaintiff incorporates by reference paragraph (1) of the facts set out above under the negligence elements, demonstrating that Ms. Reyes promptly reported Gaytan's sexual harassment to Defendant. Therefore, the *Faragher/Ellerth* defense is not available on this claim.

## III. CLAIM 2: MARIA PORTILLO'S SEXUAL HARASSMENT CLAIM

### A. Burden of Proof and Elements

Maria Portillo's sexual harassment claim is analyzed under the same elements as set out above in Section IA, relating to the sexual harassment claims of all the aggrieved individuals. Again, Defendant does not challenge the elements of the hostile environment claim, but only challenges employer liability, and conflates the negligence and vicarious liability theories. Therefore, Plaintiff incorporates by reference the legal analysis set out in Section IA above, both as to liability for negligence and vicarious liability.

## B. Elements Challenged by Defendant

### 1. Negligence Theory of Employer Liability

**Negligence Element 1: Defendant had actual or constructive knowledge of the hostile work environment.**

(1) On June 3, 2004 Tina Reyes reported to Warehouse Manager Dan Hazard that Mauricio Gaytan had exposed himself to her the day before, while she was alone at work. Reyes Dep. 81:18-85:24, 94:5-20; D. Hazard Dep., 146:24-148:14; Ex. 52.

(2) In late 2005, Mauricio Gaytan sexually harassed Leanda Michelle Villalba. Villalba Dep. 29:19-31:18, 33:20-36:22, 40:14-46:18. Ms. Villalba reported Gaytan's inappropriate behavior to Dan Hazard three times. Villalba Dep. 66:2-73:17.

(3) In December of 2007, Spud Seller received another sexual harassment complaint against Mauricio Gaytan. This second complaint against Gaytan was from Plaintiff-Intervenor Maria Portillo, who reported to Dan and then Jennie Hazard that Mr. Gaytan had blocked her egress from the building, grabbed her, and attempted to kiss her, all against her will, to the point that she had to hit him to fight him off and escape. Portillo Dep. 29:14-34:10, 60:10-63:9; Ex. 59; D. Hazard Dep. 62:9-66:3.

(4) Before Ms. Portillo reported to Dan Hazard that she had been sexually assaulted, Mauricio Gaytan told Dan Hazard that Portillo was accusing him of trying to kiss her, to which Mr. Hazard responded that he could do

nothing until Portillo reported it to him. Dan Hazard did nothing to further investigate Mr. Gaytan's statement. Ex. 59; D. Hazard Dep. 63:16-21.

(5) Also, before Ms. Portillo reported to Dan Hazard that she had been sexually assaulted, John Flores, a Quality Control inspector for Farm Fresh, Inc. (an outside company that monitored Spud Seller operations for quality), reported to Dan Hazard that Maria Portillo (nee Ramirez) had told him that Mauricio Gaytan had tried to kiss her, to which Mr. Hazard replied that Flores needed to tell Portillo to report the incident. Mr. Hazard did not investigate. Ex. 59; D. Hazard Dep. 63:16-21.

(6) On December 17, 2007 Ms. Portillo (who speaks only Spanish) came to Dan Hazard and reported, through interpreter Mary Atencio, that she wished to talk with him. She described to Dan Hazard that Gaytan had attempted to forcibly kiss her two weeks previous and that it was bothering her. The conversation lasted only a few minutes. Ex. 59; Atencio Dep. 42:2-45:11; Portillo Dep. 60:24-63:9; D. Hazard Dep. 63:22-24.

(7) On December 18, 2007, Jennie Hazard and Vanessa Duran (serving as interpreter), met with Portillo, and Portillo again reported that Gaytan had blocked her egress and forcibly tried to kiss her. Ex. 59; J. Hazard Dep. 63:11-64:14; Ex. 60.

These facts establish that Defendant had actual knowledge of the harassment at issue in this case – first from Reyes in 2005, from Villalba in 2005 or 2006, and then from Gaytan, Flores, and Portillo in 2007.

**Negligence Element 2: Defendant did not adequately respond to notice of the harassment.**

(8) At the end of the meeting, Jennie Hazard warned Portillo not to discuss her allegations against Gaytan with anyone else because she could be faced with liability for a “slander” claim. J. Hazard Dep. 66:3-16, 68:19-23.

(9) Dan Hazard investigated Portillo’s allegation by asking Gaytan if he had attempted to forcibly kiss Portillo (which Gaytan denied), and by asking Jaime Vasquez if he had witnessed Gaytan try to kiss Portillo, which Vasquez answered in the negative. D. Hazard Dep. 68:23-70:23.

(10) Maria Portillo did not at any time suggest that Vasquez had witnessed the assault, only that he was in the hallway when she exited the building after escaping Gaytan’s assault. J. Hazard Dep. 64:24-65:11; Portillo Dep. 31:14-32:2. Hazard did not question Vasquez about whether he was in that area of the building, whether he saw Ms. Portillo leaving, whether she said anything to him, whether she seemed upset, or whether he was aware of Gaytan acting inappropriately with Ms. Portillo or any other female employee.

(11) Dan and Jennie Hazard claim to have viewed video footage of the area where Ms. Portillo told them she was assaulted, and to have seen no evidence of the assault; however, the footage they ostensibly reviewed has been erased and there are no copies. J. Hazard Dep. 98:11-99:4; D. Hazard Dep. 70:24-83:13.

(12) According to Dan Hazard, the images on the surveillance footage on the interior cameras are not possible to make out after the lights in the warehouse are switched off. D. Hazard Dep. 80:16-25. Portillo testified that Gaytan had switched the lights off at the time he assaulted her. Portillo Dep. 29:14-22.

(13) Dan Hazard does not recall reviewing Gaytan's personnel file in the one day that he investigated Ms. Portillo's complaint. D. Hazard Dep. 85:12-15.

(14) In responding to Ms. Portillo's complaint, both Dan and Jennie Hazard testified that they did not remember or consider Tina Reyes' earlier allegation that Gaytan had exposed himself to her. D. Hazard Dep. 85:16-19; J. Hazard Dep. 69:5-19.

(15) After Ms. Portillo's complaint, Mauricio Gaytan was not disciplined or given additional training on sexual harassment, or warned that his conduct must change. D. Hazard Dep. 88:7-89:1; Gaytan Dep. 166:19-21; 129:14-130:18.

(16) Both Dan and Jennie Hazard believed that Portillo was lying, even though Portillo had done nothing to call into question her credibility. J. Hazard Dep. 241:9-24; D. Hazard Dep. 89:4-12.

These facts demonstrate that Defendant did not adequately respond to Ms. Portillo's complaint to correct the hostile work environment created by Gaytan, particularly in light of its knowledge of prior similar allegations.

**2. Employer Liability -- Vicarious Liability**

As with Ms. Reyes' claim, Defendant cannot meet its burden of proving both elements of the *Faragher/Ellerth* affirmative defense – (1) that Defendant exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that Ms. Portillo unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer, or to avoid harm otherwise. Defendant must prove both elements of the defense, but can prove neither.

**Vicarious Liability, Element 1 – Defendant cannot prove that it acted reasonably to prevent and promptly correct the sexual harassment.**

(1) Plaintiff incorporates by reference paragraph (1) through (7) of the facts set out above under the negligence elements for Claim 2 (Portillo negligence theory). These facts demonstrate that Defendant did not act to prevent Gaytan's sexual harassment of Portillo after it had notice, and that it did not act adequately to prevent further harassment by Gaytan. Therefore, the *Faragher/Ellerth* defense is not available on this claim.

**Vicarious Liability, Element 2 – Defendant cannot prove that Ms. Portillo unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer or to avoid harm otherwise.**

(1) Plaintiff incorporates by reference paragraphs (3) through (7) of the facts set out in the preceding section under the negligence elements, demonstrating that Ms. Portillo promptly reported Gaytan's sexual harassment to Defendant.

## CLAIM 4: CLAIM FOR PUNITIVE DAMAGES

### A. Burden of Proof and Elements

**1. To obtain punitive damages, Plaintiff must prove by a preponderance of the evidence that Defendant's conduct was undertaken with malice or reckless indifference for the victim's federally protected right to work in an environment free of sexual harassment.**

Plaintiff agrees in part but disagrees in part with Defendant Spud Seller's recitation of law under 42 U.S.C. § 1981(a)(b)(1), which governs punitive damages under Title VII. Defendant correctly states that the standard for assessing punitive damages is "malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Id.* Plaintiff agrees that it is the plaintiff's burden to prove this standard by a preponderance of the evidence. Plaintiff also agrees that malice and reckless indifference refer to the employer's knowledge or reckless disregard that its actions might violate federal law. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999); *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1212 (10th Cir. 2000). Plaintiff disagrees, however, that the affirmative defense of good-faith compliance is available to Defendant under the negligence theory of liability, as explained in more detail in the following section.

Construing *Kolstad,* the Tenth Circuit has explained the standard for imposing punitive damages. "[T]he proper question is whether the employer engaged in the conduct alleged with the "knowledge that it may be acting in violation of federal law. . . . An employer must at least discriminate in the face of a perceived risk that its action will

violate federal law to be liable in punitive damages." *EEOC v. WalMart Stores, Inc.*, 187 F.3d 1241, 1245 (10th Cir. 1999), citing *Kolstad,* 119 S.Ct. 2118 at 2125 (1999).

As set out below, the record shows that Defendant was well aware of the requirements of Title VII when it was put on notice of Gaytan's harassment, but did not adequately respond. When the record manifests ineffective, inadequate, or negligible enforcement of an employer's anti-discrimination policy, punitive damage instructions are appropriate. *See Jonasson v. Lutheran Child & Family Servs*., 115 F.3d 436, 439 (7th Cir. 1997) (belated and ineffective response justifies punitive damages); *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 931 (8th Cir. 2004) (cursory investigation and inadequate response support punitive damages); *United States EEOC v. Scolari Warehouse Mkts.*, 488 F. Supp. 2d 1117, 1140 (D. NV. 2007) (employer's inaction and failure to enforce its policies provides sufficient evidence to allow punitive damages).

**2. The affirmative defense of good-faith compliance with Title VII applies only to the theory of vicarious liability, and Defendant bears the burden of proving the defense.**

Plaintiff disagrees with Defendant that the affirmative defense of good-faith compliance is available to Defendant under both the negligence and vicarious liability theories advanced by Plaintiff. Again, Defendant fails to distinguish between the two theories of employer liability. The *Kolstad* good-faith compliance defense is not available on a negligence theory, where the employer is directly liable for its negligence. That defense only applies to the vicarious liability for punitive damages based on conduct of a supervisor or manager. *Dodoo v. Seagate Tech., Inc.*, 235 F.3d 522, 531

(10th Cir. 2000); *Hardman v. AutoZone, Inc.*, 2005 U.S. Dist. LEXIS 16307, *20-21 (D. Kan. 2005).

Under *Kolstad,* when a plaintiff asserts vicarious liability for a supervisor's conduct, the test for imputing liability to the defendant is identical to the test for actual authority. 527 U.S. at 539, 542-43 (citing *Burlington Indus.* v. *Ellerth*, 524 U.S. 742 (1998)).[7] The plaintiff bears the burden of proving that the defendant's conduct was undertaken with malice or reckless disregard to the employees' federally protected rights. *Karnes v. SCI Colo. Funeral Servs.*, 162 F.3d 1077, 1081-82 (10th Cir. 1998). At that point, the burden shifts to the defendant to prove good-faith compliance as an affirmative defense. *Romano v. U-Haul Int'l*, 233 F.3d 655, 670 (1st Cir. 2000).

The EEOC also disagrees with Defendant's attempt to posit a clearly demarcated "standard" for assessing good-faith compliance. There is no bright line rule for what constitutes good-faith efforts to comply with the mandates of Title VII. *EEOC v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1248 (10th Cir. 1999); *Cadena v. Pacesetter Corp.*, 224 F.3d at 1210. On the one hand, the employer's efforts to disseminate and enforce a sexual harassment policy can constitute productive evidence of good-faith compliance. On the other hand, proof that the policy was inadequately enforced, or that its reporting and deterrence mechanisms are ineffective, may defeat the affirmative defense. *See, e.g.*, *Romano v. U-Haul Int'l*, 233 F.3d at 670 (more than initial attempts to comply required); *Beard v. Flying J., Inc.*, 116 F. Supp. 2d 1077, 1093 (S.D. Iowa 2000) (inadequate discipline of harasser and doubt of victim's motives militate against good

---

[7] It is not disputed that Mauricio Gaytan fulfills the criteria of a managerial agent for the requisites of actual authority and punitive damages.

faith); *EEOC v. Mgmt. Hospitality of Racine*, 623 F. Supp. 2d 980, 986-87 (E.D. Wisc. 2009) (insufficient safeguards evidenced lack of good faith).

"Even if an employer-defendant adduces evidence showing it maintains on paper a strong non-discrimination policy and makes good faith efforts to educate its employees about that policy and Title VII, a plaintiff may still recover punitive damages if she demonstrates the employer failed to adequately address Title VII violations of which it was aware." *Cadena v. Pacesetter Corp.*, 224 F.3d at 1210; see also *Chavez v. Thomas & Betts Corp.*, 396 F. 3d 1088, 1098-1099 (10th Cir. 2005)(employer's excuse that it could not find sufficient proof to discipline harasser did not immunize it from punitive damages); see also *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 286 (5th Cir. 1999) (open door policy insufficient to immunize employer from punitive damages when no actual Title VII efforts made in response to complaint).

**B. Elements Challenged by Defendant**

**Element 1: Spud Seller knew its actions were in potential violation of federal law, which establishes liability under both a negligence theory and vicarious liability.**

(1) As of at least 2004, when Tina Reyes complained about Gaytan's sexual harassment, Spud Seller had a policy against sexual harassment, reflecting the company's knowledge that such conduct was unlawful. Ex. 53, at SS 0003.

(2) Jennie Hazard began working at Spud Seller in 2000 as an office assistant, and was trained to go over policies with new employees,

including the sexual harassment policy. J. Hazard Dep. 10:16-11:19, 14:6-15, 47:17-49:15.

(3) Jennie Hazard became Defendant's Office Manager in 2004. J. Hazard Dep. 15:12-16:3.

(4) When Jennie Hazard became Office Manager, Defendant had a sexual harassment policy in effect, and she was one of the designated managers to whom employees could bring sexual harassment complaints. J. Hazard Dep. 49:12-15; Ex. 53, at SS 0003.

(5) As Office Manager, one of Jennie Hazard's duties was to keep employee policies current, and to do that, she consulted with Mountain States Employers Council. J. Hazard Dep. 33:3-12; Ex. 61, at EEOC 00330 (identifying Mountain States).

(6) Dan Hazard began working for Spud Seller in 2002 as Warehouse Manager, and had Human Resources responsibilities. D. Hazard Dep. 8:11-14, 12:22-13:4

(7) As Warehouse Manager, Dan Hazard trained employees annually on the company's sexual harassment policy. D. Hazard Dep. 130:12-131:3.

(8) When Tina Reyes complained about sexual harassment, Dan Hazard held a meeting to investigate the matter, indicating he knew that if her allegations were true, the company had a legal obligation to take prompt action to stop the harassment. Ex. 52; D. Hazard Dep. 149:15-23.

(9) When Tina Reyes complained about sexual harassment in 2004, Defendant decided it was unnecessary to interview any of the other female employees to find out whether there were any other reports of inappropriate sexual conduct by Gaytan in the workplace. Ex. 52; J. Hazard Dep. 149:23–150:15.

(10) When Tina Reyes complained about sexual harassment in 2004, Defendant decided it was unnecessary to discipline Gaytan, to require him to undergo additional sexual harassment training, or to monitor Gaytan's behavior more closely to ensure that he was not sexually harassing his female subordinates. D. Hazard Dep. 88:7-89:12, 160:23-161:2; Gaytan Dep. 166:7-21; 129:14-130:18.

(11) In January, 2005, when Ms. Hazard wanted to discipline or fire Tina Reyes for talking to other employees about sexual harassment, Ms. Hazard called Mountain States Employers Council for legal advice. Ex. 34, at EEOC 00271; J. Hazard Dep. 158:3-160:15.

*(12)* Ms. Hazard was told by MSEC that terminating Ms. Reyes for discussing sexual harassment with her coworkers could be grounds for a "wrongful discharge" suit. *Id.*

(13) After obtaining advice from MSEC, on January 25, 2005, Mr. Hazard proceeded to issue Tina Reyes a written warning which prohibited her from discussing her sexual harassment allegations with coworkers under

threat of further disciplinary action. Ex. 34, at EEOC 00271; Ex. 35; D. Hazard Dep. 170:7-172:2; J. Hazard Dep. 158:3-24.

(14) In 2006, Mr. Hazard knew that sexual harassment was a serious violation of federal law. Mr. Hazard documented his attempt to correct the behavior of employee Blas Villa. When Villa denied that his actions constituted sexual harassment, Dan Hazard, along with issuing Villa a final warning, provided Villa a copy of "sexual harassment law." Ex. 62; Ex. 63.

(15) The letter Dan Hazard gave to Villa stated, *inter alia*, that sexual harassment was "unlawful" and "a serious offense." Dan Hazard also reiterated that, "[w]ith this letter you will also find a copy of Employment Discrimination title VII of the civil rights act of 1964." Ex. 64.

(16) In 2009, when Shanan Cisneros complained of sexual harassment by Gaytan, Defendant did nothing to investigate the allegations or stop the harassment. Cisneros Dep. 38:1-40:24.

(17) After Leanda Michelle Villalba was harassed in 2005, she complained of sexual harassment by Gaytan, and Defendant did nothing to investigate the allegations or stop the harassment. Villalba Dep. 34:6-36:22; 41:7-46:18.

(18) Dan Hazard memorialized his meeting with and subsequent investigation of Maria Portillo's sexual harassment complaint, which is not a standard investigative procedure at Spud Seller. D. Hazard Dep. 91:6-92:10; Ex. 59.

Based on the fact that Defendant had a sexual harassment policy in 2004 when Tina Reyes complained, and Defendant held a meeting to investigate the allegations, a jury may reasonably infer that when Defendant decided it was unnecessary to interview any additional employees, and unnecessary to discipline Gaytan or monitor his conduct more closely, Defendant acted in the face of a perceived risk that failing to adequately address the allegations could result in continued unlawful sexual harassment of women. Moreover, based on the fact that Ms. Hazard had been consulting with Mountain States Employers Council in developing policies, and obtained legal advice in January of 2005, before disciplining Tina Reyes for discussing sexual harassment with her co-workers, the jury may reasonably infer that Defendant had access to legal advice, such that Defendant knew or should have known that it had a legal obligation to prevent sexual harassment in the workplace, and that it failed to do so in the face of a perceived risk that its conduct was unlawful. Similarly, based on Mr. Hazard's interactions with Mr. Villa, a jury may reasonably conclude that by 2006, Defendant was undoubtedly aware of its obligations to stop sexual harassment in the work place, so that on each occasion when female employees complained in 2007 and 2009, Defendant acted in the face of a perceived risk when it still failed to discipline or monitor Gaytan, or take other action to stop the harassment. The jury may infer from this evidence that Defendant knew its legal obligations and acted in the face of a perceived risk that its inaction was unlawful.

**Element 2: Under the vicarious liability theory, Defendant has failed to establish the affirmative defense that it made reasonable good-faith efforts to comply with Title VII, because the record shows its policy was ineffective in preventing and correcting Gaytan's conduct.**

(19) After Tina Reyes reported in June 2004 that she had been sexually harassed by Mauricio Gaytan, Mr. Gaytan was neither disciplined nor demoted, was not required to undergo additional sexual harassment training, and received a substantial raise the following year. Nor did Defendant take any prophylactic measures, such as monitoring Gaytan more closely. Nor did it interview any other women to attempt to learn whether any other women had any similar experiences. Ex. 33, at EEOC 00244; D. Hazard Dep. 88:7-89:12, 160:23-161:2; Gaytan Dep. 166:7-21; 129:14-130:18.

(20) Ms. Reyes was later disciplined for discussing her allegations with coworkers. Ex. 34, at EEOC 00271; Ex. 35.

(21) In late 2005, Mauricio Gaytan sexually harassed Leanda Michelle Villalba. Villalba Dep. 29:19-31:18, 32:20-36:22, 40:14-46:18.

(22) Ms. Villalba reported Gaytan's inappropriate behavior to Dan Hazard on three occasions after she was harassed in 2005. Villalba Dep. 66:2-73:17.

(23) In 2006, Gaytan sexually harassed Mary Atencio. Atencio Dep. 25:11-27:7, 31:24-32:19, 36:3-25.

(24) About three to four months before April Cordova was terminated in March 2006 (i.e. late 2005 and early 2006), Gaytan sexually harassed April Cordova. Cordova Dep. 22:22-24:2, 27:4-16.

(25) In July and August of 2007, Gaytan sexually harassed Dreamisha Guerrero, causing her to quit her job. Guerrero Dep. 36:24-40:14.

(26) When Ms. Guerrero quit on August 31, 2007, she told Dan Hazard that it was because she felt really uncomfortable working around the men, and felt she was being looked at and reacted upon as a sex symbol. Guerrero Dep. 42:5-43:7.

(27) In 2007, Mauricio Gaytan sexually harassed Shane Gomez. Gomez Dep. 32:9-25, 33:12-34:2, 38:17-40:1, 41:8-42:11, 43:17-44:10, 46:5-47:20, 49:25-51:24.

(28) In December of 2007, Maria Portillo was sexually assaulted by Mr. Gaytan, after months of sexual comments and gestures. Mr. Portillo reported Mr. Gaytan's conduct to Defendant. Ex. 59.

(29) After Maria Portillo's complaint in December of 2007, Mauricio Gaytan received neither discipline nor demotion, was not required to undergo additional sexual harassment training, and received a substantial pay increase the following year. D. Hazard Dep. 88:7-89:1; Gaytan Dep. 166:19-21; 129:14-130:18; Ex. 41; Ex. 42.

(30) On June 10, 2008, Ms. Portillo filed a charge of discrimination with the EEOC, alleging sexual harassment by Mr. Gaytan. Ex. 43, at EEOC 00097.

(31) In April of 2009, on the same day that Shanan Cisneros was hired as a sorter, Gaytan promoted her into a higher-paying ticket-writing job, and

two of the older women employees told her to watch out. Cisneros Dep. 29:5-31:3. Gaytan then sexually harassed Ms. Cisneros. Cisneros Dep. 31:20-51:4.

(32) In March and April of 2009, Mr. Gaytan sexually harassed Leticia Salazar. Salazar Dep. 27:16-31:8.

(33) Shortly before Shanan Cisneros left her job in October of 2009, Mr. Gaytan sexually harassed her, and she immediately reported the conduct to Dan Hazard. Cisneros Dep. 38:1-40:24.

(34) After October of 2009, when Shanan Cisneros had left Spud Seller and was desperate for employment, Mauricio Gaytan promised to get her job back if she had sex with him. Cisneros Dep. 51:9-59:21, 63:6-64:19.

(35) In December 2009, Mauricio Gaytan sexually harassed Joni Mae Marquez. Marquez Dep. 47:15-50:5, 53:11-54:12, 124:4-125:7.

(36) In April 2010, after Joni Mae Marquez returned from maternity leave, Mr. Gaytan sexually harassed her again, and she walked off the job because of it. Marquez Dep. 50:6-52:15, 54:3-12, 76:3-82:5, 83:7-84:22.

These facts demonstrate that in spite of complaints from four different women that its supervisor was repeatedly sexually harassing its female employees, Defendant failed to take any action to stop the harassment. To the contrary, Defendant effectively fostered and condoned the sexual harassment by promoting the harasser to an even more powerful position and giving him pay raises. Thus, there is ample evidence for a jury to reasonably infer that Defendant did not, in fact,

act in good faith because it failed to take any effective steps to actually enforce its own policy. Accordingly, Defendant's motion must be denied.

## **CONCLUSION**

For six years after Defendant first received a sexual harassment complaint about plant supervisor Mauricio Gaytan in 2004, he continued to harass his female subordinates unabated. Although Defendant had a policy on paper, its own inaction in the face of widespread harassment spoke louder than its employee handbook. Even so, several of the harassed women continued to complain, and Defendant still took no action to stop Gaytan until late 2010, when he was demoted for reasons unrelated to his sexual conduct.

Under either a negligence analysis or a vicarious liability analysis, the analysis turns on whether Defendant acted reasonably to promptly correct the sexual harassment. On a negligence theory, it is plaintiff's burden to show the employer failed to reasonably respond. On a vicarious liability theory, part of the defendant's burden is to show the converse – that it did respond reasonably. In this case, there is ample evidence for a jury to find that Defendant utterly failed in its legal obligation to promptly correct sexual harassment. Accordingly, contrary to what Defendant asserts, summary judgment must be denied as to the individual claims of Ms. Reyes and Ms. Portillo, as well as Defendant's affirmative defense to vicarious liability. As to punitive damages, there is ample evidence that Defendant knew it was legally obligated to stop sexual harassment in the workplace, and that its deliberate failure to respond to any of the six complaints made by four different women, was in reckless disregard for the federally

protected rights of its female employees to work in an environment free of sexual harassment. And finally, based on Defendant's utter failure to respond to any of the women's repeated complaints of sexual harassment, a jury may reasonably find that Defendant failed to make any good faith effort to enforce its own anti-harassment policy. Accordingly, Defendant's motion must be denied in its entirety.

Dated this 23d day of January, 2011.

Respectfully Submitted,

RITA BYRNES KITTLE
Supervisory Trial Attorney

s/ *William E. Moench*
WILLIAM E. MOENCH
Trial Attorney
Telephone: (303) 866-1378
william.moench@eeoc.gov

IRIS HALPERN
Trial Attorney
Telephone: (303) 866-1374
iris.halpern@eeoc.gov

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Denver Field Office
303 East 17th Avenue, Suite 410
Denver, CO 80203
Facsimile: (303) 866-1375

Attorneys for Plaintiff EEOC

**CERTIFICATE OF SERVICE**

I hereby certify that on January 23, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Daniel R. Satriana, Jr
satrianad@csbattorneys.com
Matthew Y. Biscan
biscanm@csbattorneys.com

Linda Ann Surbaugh
co2linda@aol.com
Jenifer Cari Rodriguez
jcrodriguez@colegalserv.org
Jennifer Jung-Wuk Lee
jlee@colegalserv.org

s/ *William E. Moench*___

WILLIAM E. MOENCH
Trial Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Denver Field Office
303 East 17th Avenue, Suite 410
Denver, CO 80203
Telephone: (303) 866-1378
Facsimile: (303) 866-1375
william.moench@eeoc.gov
Attorney for Plaintiff