**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger**

Civil Action No. 10-cv-02381-MSK-KLM

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,**

       **Plaintiff,**

**MARIA PORTILLO, aka MARIA DE JESUS RAMIREZ,**

       **Plaintiff-Intervenor**

**v.**

**THE SPUD SELLER, INC.,**

       **Defendant.**

---

### OPINION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT

---

**THIS MATTER** comes before the Court on the Motion for Summary Judgment **(#42)** filed by Defendant The Spud Seller, Inc. ("Spud Seller"), to which Plaintiff Equal Employment Opportunity Commission ("EEOC") **(#44)** and Plaintiff-Intervenor Maria Portillo responded **(#43)**. The Defendant replied **(#48)**. Having considered the same, the Court **FINDS** and **CONCLUDES** the following.

### I.   Jurisdiction

The Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

### II.   Issue Presented

This action is brought by the EEOC pursuant to 42 U.S.C.§ 2000e-5(f) and (g) **(#5).** It asserts that a hostile work environment existed at Spud Seller, in which female processing plant

employees, including Maria Portillo, were subjected to sexual harassment by their supervisor, Mauricio Gaytan.  During the course of discovery, the EEOC identified  nine additional women who were also allegedly subjected to sexual harassment by Mr. Gaytan.  Those women have not intervened in this action and will be referred to collectively as the "other aggrieved persons" in statutory contexts or as the Complainants.  The EEOC seeks various forms of equitable relief, monetary relief for Ms. Portillo and other aggrieved persons, and imposition of punitive damages for Spud Seller's malicious and reckless conduct.

Ms. Portillo intervened **(#6, 8)**, asserting a single claim for sexual harassment pursuant to 42 U.S.C. § 2000e-2(a).  She seeks an award of monetary damages, punitive damages, and her costs and reasonable attorney fees **(#9).**

Spud Seller moves for summary judgment on all claims, except the EEOC's request for individualized damages for two Complainants, S. Cisneros and Villalba, for which Spud Seller concedes a trial is necessary.  For purposes of its motion, Spud Seller also concedes the existence of a "hostile work environment" and the alleged actions of Mr. Gaytan.

Spud Seller contends that the undisputed facts are insufficient to establish *prima facie* claims by the EEOC and Ms. Portillo.  Even if there is a sufficient showing of *prima facie* claims, Spud Seller contends that it prevails as a matter or law on its "*Faragher/Ellworth*" affirmative defense.  Spud Seller seeks summary judgment on the EEOC's and Ms. Portillo's request for an award of punitive damages.  Finally, Spud Seller seeks a determination that Complaints other than S. Cisneros and Villalba cannot be awarded individualized damages.

### III.   Material Facts

The Court has reviewed all of the parties' submissions.  The following represents the undisputed facts and disputed facts, the evidence of which has been viewed in a light most favorable to the non-movants, the EEOC and Ms. Portillo.

The Spud Seller, a Colorado corporation, is a wholesaler of potatoes.  It has more than 15 employees.  Its physical plant, where potatoes are sorted, inspected and packed, is located in Monte Vista, Colorado.  Its Monte Vista operations are managed by Dan Hazard and Jennie Hazard.  Before 2005, Mr. Gaytan was the floor foreman at the Monte Vista plant; thereafter until 2010, he was the assistant manager.

Maria Portillo and the other Complainants were hourly plant workers who Mr. Gaytan supervised.  Each recites incidents in which Mr. Gaytan engaged in sexual harassment – including propositioning them for sex, exposing himself, rubbing himself against them with an erect penis, grabbing their buttocks and breasts, standing behind them like he was "humping" them, warning them not bend over because it was an invitation to engage in sexual conduct, making lewd comments, telling them that he liked their "ass" and that they looked good, asking them out on dates, and describing his sexual encounters with his wife.  Facts pertinent to each of their experiences are set forth below.

### A.  The Complainants

#### 1.      Tina Reyes

Ms. Reyes began working at Spud Seller in 2002.   In June 2004, she reported to Mr.

Hazard that Mr. Gaytan had exposed himself to her.[1]

In response, Mr. Hazard convened a meeting with Ms. Reyes, Mr. Gaytan, Ms. Hazard, and Ms. Reyes' cousin Willie Gallegos[2].  Ms. Reyes repeated her allegation, which Mr. Gaytan denied.  According to a memo prepared shortly after the meeting, the Hazards "determined that inappropriate behavior between the two in the manner of comments and sexual innuendos had occurred prior to this time, and even prior to their employment at the Spud Seller. . . . Mr. Gaytan and Ms. Reyes were advised that any behavior between them should be professional and work related only or termination would result."  Ms. Reyes was told not to discuss the issue.  No further investigation was conducted, and there does not appear to have been any limitation placed on Mr. Gaytan's supervision of Ms. Reyes.  There is no evidence that Mr. Gaytan harassed Ms. Reyes in any manner after the meeting occurred.

In January 2005, Ms. Reyes received a written reprimand in response to another employee's complaint that she was talking about Mr. Gaytan's alleged harassment and that Ms. Reyes used foul or vulgar language.  Ms. Reyes denied that she used vulgar language at work, but signed the reprimand.  Ms. Reyes resigned from Spud Seller in September 2005 for personal reasons and because of her discomfort around Mr. Gaytan.

### 2.    Leanda Michelle Villalba

Ms. Villalba began working at Spud Seller in 2005.  In late 2005, Mr. Gaytan showed and texted sexually explicit cartoons to her.  She told him to stop, but he continued the behavior

---

[1]According to Ms. Reyes, Mr. Gaytan made lewd comments to her before he exposed himself to her, but she did not complain to Spud Seller's management about this.

[2]There is a factual dispute as to why Mr. Gallegos was present, but it is not necessary to resolve that issue.

for some time.  Mr. Gaytan also made obscene gestures toward her and, when passing behind her in close quarters, brushed his genitals against her buttocks.

Ms. Villalba complained three times to Mr. Hazard between 2005 and 2008 about Mr. Gaytan's inappropriate texts and comments.  According to Ms. Villalba, Mr. Hazard said he would talk to Mr. Gaytan, but Ms. Villalba is unaware of what happened after her complaints.  There is no evidence that Mr. Hazard investigated these complaints, or that he met with, counseled, or disciplined Mr. Gaytan.  Ms. Villalba resigned in 2008.

### 3.  Marie Atencio

Ms. Atencio worked for Spud Seller between October 1989 and July 2008.  During her employment, but particularly in 2006, Mr. Gaytan made multiple inappropriate sexual comments to her, including explicitly describing his sexual activities with his wife.  Ms. Atencio did not inform the Hazards or any other owner or manager of this conduct.  She voluntarily resigned.

### 4.  April Cordova

Ms. Cordova was employed at Spud Seller between April 2005 and March 2006.  During that time, Mr. Gaytan stood uncomfortably close to her while supervising her, sometimes leaning against her.  He chastised her for taking too much time for restroom breaks, and waited outside the restroom door when she used the restroom.  Ms. Cordova did not report this conduct to the Hazards or anyone else in management.  Ms. Cordova's employment was involuntarily terminated for bringing alcohol to a co-worker.

### 5.  Dreamisha Guerrero

Ms. Guerrero worked at Spud Seller during July and August 2007.  During this time, Mr. Gaytan made sexually suggestive comments and once grabbed her buttocks.  She did not

complain to the Hazards or anyone else in management.  Ms. Guerrero left her employment

voluntarily.  However, when she left, she told Mr. Hazard that she quit because felt like she was

being looked at "like a sex symbol" by male co-workers.

### 6.      Shane Gomez

Ms. Gomez worked intermittently at Spud Seller between 2004 and 2011.  Mr. Gaytan

made comments about her physical appearance, made sexual jokes, grabbed his crotch and made

lewd comments to her, showed her sexually explicit text messages, and on one occasion called

her and asked her to go out on a date, threatening to fire her if she did not comply.  Ms. Gomez

did not report Mr. Gaytan's conduct to the Hazards or anyone else in management.  Ms. Gomez

stopped working at Spud Seller because she was uncomfortable around Mr. Gaytan.

### 7.      Maria Portillo

Ms. Portillo worked at Spud Seller for a during a short period of time in 2006,  and

returned in 2007.  Ms. Portillo speaks and reads only Spanish.  During 2007, Mr. Gaytan made

lewd comments and gestures toward her, but she did not report them.  But on December 7, 2007,

when Ms. Portillo was preparing to leave for the day, Mr. Gaytan closed the door to the area

where she was working and turned off the light.  He put his arms around her from the front and

attempted to kiss her.  She kneed him and fled.

Ms. Portillo told a few co-workers about what had occurred.  Mr. Hazard was informed

that Ms. Portillo had complained that Mr. Gaytan had tried to kiss her against her will.  Mr.

Hazard took no action, stating that he would have to wait until Ms. Portillo complained to him.

Approximately two weeks after the incident, Ms. Portillo complained to Mr. Hazard.

She relied on Marie Atencio, a co-worker, to interpret for her.  Ms. Portillo described what

happened, and in response to a question by Mr. Hazard, identified Jamie Vasquez, another employee, as someone who might have been standing outside the room where the incident occurred and who might have seen Mr. Gaytan close the door.  Mr. Hazard told Ms. Portillo to stay away from Mr. Gaytan, and that he would investigate.

Ms. Hazard then met with Ms. Portillo.  Ms. Portillo repeated her account of the incident, and another office employee interpreted.  Ms. Hazard told Ms. Portillo not to talk about the incident with other employees and warned of possible consequences for "slanders."

Mr. Hazard spoke with Mr. Gaytan, who denied Ms. Portillo's accusation.  Mr. Hazard also spoke with Jamie Vasquez, who stated that he did not see Mr. Gaytan attempt to kiss Ms. Portillo.  However, it does not appear that inquiry was made into whether he saw the door close or whether he saw Ms. Portillo emerge after the incident, and if so, what her demeanor was or whether she said anything.

Both Mr. and Ms. Hazard reviewed security camera video footage of the area where the incident allegedly occurred, but they saw nothing on the video.  They later admitted that this could have been attributable to the lights having been turned off, as alleged by Ms. Portillo.

The Hazards engaged in no further investigation and took no further action.  They concluded that Ms. Portillo was not telling the truth, but did not report their conclusions to her or give her the opportunity to supply further information.  They took no action with regard to Mr. Gaytan.

Mr. Gaytan did not engage in any further harassing conduct toward Ms. Portillo.  Although they continued to work in the same space and Mr. Gaytan continued as Ms. Portillo's supervisor, he gave her only work instructions.  Ms. Portillo left her employment approximately

two weeks later.  She stated that her departure was because she did not want to be around Mr.

Gaytan and she had health concerns.  Ms. Portillo thereafter filed a charge of discrimination with

the EEOC.

### 8.    Leticia Salazar

Ms. Salazar began working at Spud Seller in December 2008.  Mr. Gaytan touched her

back, made sexual comments to her, and propositioned her.  Ms. Salazar did not complain to the

Hazards or anyone else in management.  She voluntarily left her employment at Spud Seller in

July 2009.

### 9.    Shanan Cisneros

Ms. Cisneros worked for Spud Seller between April and October 2009.  During that time,

Mr. Gaytan commented on her physical appearance, made sexual comments to her, and grabbed

or slapped her buttocks on several occasions.  He touched her breast while pretending to trip and

fall.

Ms. Cisneros told Mr. Hazard about Mr. Gaytan's grabbing her buttocks and touching her

breast.  Mr. Hazard said that he would talk to Mr. Gaytan, but Ms. Cisneros was never told what

happened.  Mr. Gaytan continued making lewd comments to Ms. Cisneros throughout the course

of her employment.[3]

---

[3] Apparently, Mr. Gaytan's interest in Ms. Cisneros continued after she left Spud Seller.
Mr. Gaytan told Ms. Cisneros that she could get her job back if she came over to his house.
When she went to his home, his wife was gone.  Mr. Gaytan then told her she could get her job
back if she had sex with him.  Ms. Cisneros did so, but did not report the incident either to the
police or to management personnel at Spud Seller.

Because this incident occurred outside of the workplace at a time when Ms. Cisneros was
not an employee, it is not separately actionable.  *Wilson v. Muckala*, 303 F.3d 1207 (10th Cir.
2002) (prior incidents of harassment that occurred outside workplace not relevant to
determination of whether hostile work environment existed).  However, the Court expresses no

**10.     Joni Mae Marquez (now Joni Mae Cisneros**)

Ms. Marquez worked at Spud Seller between December 2009 and February 2010.  Ms. Marquez was pregnant when she was hired.  She complained to Mr. Hazard that "Mariano," a co-worker, squeezed her breast.  In response, Mr. Gaytan told Mariano not to do that again and he did not.

Mr. Gaytan touched Ms. Marquez' belly and made inappropriate, but not explicitly sexual, comments to her.  He also whistled and made catcalls.  On one occasion when Ms. Marquez was assigned to clean the bathrooms, Mr. Gaytan came into the bathroom and closed the door.  He took no action; just stood in the room while she was working.  She felt intimidated and threatened, and after this incident, refused to clean the bathrooms.

Ms. Marquez left Spud Seller without notice, after Mr. Gaytan told her to follow him to the bathroom to clean it, put his hand around his waistband and said something like, "Come into the bathroom, I'm alone."  Ms. Marquez never reported incidents involving Mr. Gaytan to the Hazards.

**B.     Spud Seller's Policies and Procedures**

During the relevant time period, Spud Seller used an Employee Handbook that contained a policy prohibiting sexual harassment.  The policy described sexual harassment as (1) "Physical abuse, such as touching, feeling, patting and fondling"; (2) "Conditioning continued employment, promotions, or raise[s] on sexual favors"; and (3) "Creating a 'hostile' environment because of a person's sex, even when you are not directly endangering their job."  The Handbook directed employees to report incidents of sexual harassment to "your supervisor, the

---

opinion as to the admissibility of such evidence in conjunction with properly brought claims.

Office Manager [Jennie Hazard], or Lynn McCullough, whichever person you feel most comfortable discussing it with."  Def.'s Exs. 1 & 2, **#42-1** & **#42-3**.  It advised employees that, "You can feel safe that your complaint will receive immediate attention and if the facts support your complaint, the offender will be disciplined."  *Id*.

The Handbook was printed only in English.  For employees who did not speak or read English, it was "explained"  in Spanish.

Spud Seller also required all new employees to watch an orientation video tape (in both English and Spanish) that included a few sentences on sexual harassment.  The tape described in general sexual harassment and stated that sexual harassment was forbidden.  At least once a year, Spud Seller reviewed the sexual harassment policy with employees at an employee meeting. Either Mr. Gaytan or another employee interpreted the explanation into Spanish.

Ms. Portillo and the other Complainants signed acknowledgment forms stating that they received the handbook and understood its contents and that they viewed the orientation video.

## IV.   Standard of Review

Although Rule 56 of the Federal Rules of Civil Procedure was recently restyled, its purpose remains the same – to provide for a summary determination when no trial is necessary. *See White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Accordingly, Rule 56(a) directs entry of a judgment on a claim or defense, or part thereof, when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242,

248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" if the evidence presented in support of and in opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c). Once the moving party has met its burden, to establish a genuine dispute that requires a trial, the responding party must present competent and contradictory evidence as to a material fact. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).

When the moving party does not have the burden of proof on the pertinent issue, it may point to an absence of sufficient evidence to establish a claim or defense that the non-movant is obligated to prove. Once the movant has done so, the respondent must come forward with sufficient competent evidence to establish a *prima facie* claim or defense to justify a trial. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## V.   Analysis

This action is brought by the EEOC in exercise of its authority found in 42 U.S.C. §2000e-5(f).  In an action brought pursuant to 42 U.S.C. §2000e-5, the EEOC can seek relief on behalf of a "person or persons aggrieved" by the alleged unlawful employment practice, with or without the aggrieved persons' consent.  Although it may stem from a formal charge of discrimination, the scope of the investigation and trial is not confined to the allegations in that charge.  *EEOC v. Delight Wholesale Co,* 973 F.2d 664, 668 (8th Cir. 1992).  The lawsuit may include any discrimination like or related to the substance of the allegations in the charge and that reasonably can be expected to grow out of the investigation triggered by the charge.  The EEOC is not limited to make-whole relief for particular employees; it can seek to vindicate a public interest.  *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 296 (2002).

In this case, there are only two claims asserted – those of the EEOC and of Ms. Portillo. As noted, *supra,* issues concerning recovery by the other Complainants arise in the context of the EEOC's request for an award for other "aggrieved persons."  Conceptually, if the EEOC has no triable claim, there is no issue as to whether the Complainants can recover individualized damages.  The EEOC's claim and Ms. Portillo's claim overlap as to certain factual allegations and for the purposes of the motion at issue are considered together.  That is where the Court's analysis starts.

A.     **Claims by the EEOC and Ms. Portillo**

Title VII prohibits employment discrimination on the basis of sex.  42 U.S.C. §2000e-2(a).  Sexual harassment that is sufficiently severe or pervasive so as to alter the conditions of an employee's employment and create an abusive working environment qualifies as unlawful sex discrimination under Title VII.  *Meritor Savs. Bank v. Vinson*, 477 U.S. 57, 67 (1986).  For the

purposes of its motion, Spud Seller concedes the existence of a hostile work environment at its

Monte Vista plant and that Mr. Gaytan sexually harassed Ms. Portillo and others.  The focus of

Spud Seller's Motion for Summary Judgment is on whether it is liable for Mr. Gaytan's conduct.

The parties agree that an employer can be held liable for a supervisory employee's

discriminatory conduct under two legal theories – the employer's negligence, or vicarious

liability for the employee's conduct.  Spud Seller contends that Ms. Portillo and the EEOC

cannot establish a *prima facie* claim on either theory.  If sufficient evidence is shown, Spud

Seller contends that it is entitled to judgment in its favor based on its *Faragher/Ellerth*

affirmative defense.  As to the adequacy of the evidence to support the claim, the EEOC and Ms.

Portillo have the burden.  As to the affirmative defense, Spud Seller has the burden.

### 1.    Negligence

An employer can be liable for an employee's harassing conduct if the employer "knew or

should have known about the conduct and failed to stop it."  *Bertsch v. Overstock.com*, 684 F.3d

1023, 1027 (10th Cir. 2012) (citation omitted).  To establish this liability, a plaintiff must come

forward with evidence sufficient to establish that (1) the employer had actual knowledge or

constructive notice of the harassment, and (2) the employer's remedial and preventive responses

to the harassment were inadequate.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir.

1998).

With respect to the first element, "an employer is only obligated to respond to harassment

of which it actually knew, or in the exercise of reasonable care should have known."  *Adler*, 144

F.3d at 673.  Actual knowledge is established where the plaintiff has reported harassment to a

management-level employee.  *Id*.  Constructive notice may be inferred when the harassment is "highly pervasive" and should, in the exercise of reasonable care, have been discovered by management-level employees.  *Id*.  Reports by other employees that should have put the employer on notice may be considered in determining whether the employer had constructive knowledge of the harassment, depending on the "extent and seriousness of the earlier harassment and the similarity and nearness in time to the later harassment."  *Tademy v. Union Pacific Corp*., 614 F.3d 1132, 1147 (10th Cir. 2008).

Whether an employer's response is adequate focuses on whether the remedial and preventive action was "reasonably calculated to end the harassment."  *Adler*, 144 F.3d at 676. Cessation of the harassment is evidence of effectiveness, but is not the sole factor to be considered.  *Id*.  "[S]imply indicating to a perpetrator the existence of a policy against harassment is usually insufficient."  *Id*.  The employer's response to repeat conduct is also a factor to consider.  *Id*.

The Court finds that the EEOC and Ms. Portillo have come forward with sufficient evidence, if credited by a jury, to establish both elements of a negligence claim. Construing the evidence most favorably to the EEOC and Ms. Portillo, it appears that there were complaints to Mr. Hazard about sexual conduct by Mr. Gaytan toward female subordinates in 2004 and 2005. It is undisputed that in 2007, Mr. Gaytan and John Flores (a quality control inspector with an outside firm) reported to Mr. Hazard that Ms. Portillo complained that Mr. Gaytan has assaulted her.  Mr. Hazard took no action to inquire or investigate.  Ultimately, Ms. Portillo complained directly to Mr. Hazard, detailing Mr. Gaytan's attempt to kiss her in a dark room after her shift. From this evidence, a jury could reasonably find that Spud Seller had both notice and/or actual

14

knowledge of harassment by Mr. Gaytan.

As to the second element, Spud Seller contends that its response was reasonably calculated to end, and did end, the harassment.  It is undisputed that both Mr. and Ms. Hazard interviewed Ms. Portillo with the assistance of an interpreter.  Ms. Portillo gave detailed information about the incident and identified Mr. Vasquez as standing in the hallway outside the room where it occurred.  She was told to stay away from Mr. Gaytan and not to talk about the incident.

The Hazards investigated Ms. Portillo's complaint by talking to Mr. Gaytan and Mr. Vasquez and reviewing the security video tape for the area where Ms. Portillo said the assault occurred.  Mr. Gaytan denied the incident.  Mr. Vasquez said that he did not see the incident, but no inquiry was apparently made as to where he was at the time or whether he saw anything else that would tend to confirm the contradictory statements of Ms. Portillo and Mr. Gaytan.  The Hazards' review of the security video showed nothing, but the Hazards admit that this could have been due to the lights being off as alleged by Ms. Portillo.  The tape is no longer available for review.  The Hazards did not re-contact Ms. Portillo or engage in any further investigation. In the absence of witness confirmation or a video record, they credited Mr. Gaytan's denial and took no further action.

Ms. Portillo and the EEOC contend that a jury could reasonably conclude that this does not reflect a good faith investigation, but instead a premature conclusion that Ms. Portillo's complaint was unsubstantiated.  Without assessing the weight or persuasiveness of the evidence, the Court finds it to be sufficient to raise a genuine issue of material fact as to whether Spud Seller conducted an adequate investigation or reached a premature conclusion that Ms. Portillo's

complaint was unsubstantiated.

The Hazards' investigation of Ms. Portillo's complaint was limited to Mr. Gaytan's categorical denial,  Mr. Vasquez' statement that he did not see the incident and an inconclusive video.  There was no investigation of what Mr. Vasquez saw, no attempt to seek further information from Ms. Portillo.  In addition, it appears that Mr. Hazard did not review Mr. Gaytan's personnel file to determine whether there had been other similar incidents, or recall and consider the incident reported to him in 2004 by Tina Reyes or three incidents reported to him in 2005 by Leanda Villalba.

Spud Seller argues that whatever defects in its investigation, the incident was not repeated with Ms. Portillo, thus its remedial actions were sufficient.  Indeed, cessation of harassment is evidence of an adequate remedial action, but it is not necessarily dispositive. Here, Ms. Portillo left Spud Seller within two weeks after the incident.  It appears that neither Ms. Portillo nor Mr. Gaytan were provided with information that the investigation had been concluded.  This together with evidence of other incidents by Mr. Gaytan could lead a jury to discount the effect of Spud Seller's responses.

The Court finds that the evidence proffered by the EEOC and Ms. Portillo is sufficient to raise a genuine issue as to whether Spud Seller was negligent in responding to Ms. Portillo's complaint.  The next question is whether such claim is barred by an affirmative defense. Initially, Spud Seller asserted the *Faragher/Ellerth* affirmative defense.  However, the EEOC argued in its Response (and the Court does not understand Spud Seller to dispute) that the *Faragher/Ellerth* defense applies only to claims of vicarious liability.  Accordingly, a trial is required on this claim, and Spud Seller's request for summary judgment must be denied.

### 2.     Vicarious Liability

An employer may be held liable vicariously for the conduct of a supervisory employee who misuses his authority to engage in unlawful conduct.  *Harrison v. Eddy Potash, Inc.*, 158 F.3d 1371, 1375 (10th Cir. 1998); *Helm v. Kansas*, 656 F.3d 1277, 1285 (10th Cir. 2011).  If a supervisor's harassment culminates in a tangible employment action, such as the discharge, demotion, or undesirable reassignment of an employee, the employer is strictly liable – no affirmative defense is available.  *Id.*  If, however, the harassment does not result in a tangible employment action, the employer may avoid liability if it can establish what has become known as the *Faragher/Ellerth* affirmative defense.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764-65 (1998).

Spud Seller contends that it is not subject to strict liability because Mr. Gaytan's harassment of Ms. Portillo did not result in a tangible employment action.  Ms. Portillo and the EEOC dispute this, contending that she was subjected to constructive discharge.  As to this issue, the EEOC and Ms. Portillo carry the burden of showing sufficient evidence to prove a tangible employment action.

Assuming that it is not subject to strict liability for Mr. Gaytan's actions, Spud Seller seeks summary judgment in its favor on the *Faragher/Ellerth* defense.  On this issue, Spud Seller bears the burden of proof and must therefore come forward with sufficient facts to prove the defense.  If it does not, or if the EEOC or Ms. Portillo proffer evidence creating a genuine dispute of material fact, the claim must proceed to trial.

### a.     Tangible Employment Action

The Court first turns to whether the strict liability standard applies, that is, whether Ms.

Portillo suffered  a tangible employment action.  She submits that she was constructively discharged.

Constructive discharge occurs when an employee voluntarily leaves their employment due to working conditions that a reasonable person would consider to be intolerable.  In essence, the working conditions are so onerous that the employee is compelled to leave.  *Yearous v. Niobrara Cnty. Memorial Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997).  The standard is an objective one, and thus the subjective perceptions by the employee and employer are irrelevant. *Strickland v. United Parcel Serv., Inc.,* 555 F.3d 1224, 1228 (10th Cir. 2009).  For example, just because the employee subjectively considers the workplace stressful and suffers personal health problems as a result "is not an objective criterion used to determine if a reasonable employee would have been compelled to resign."  *Potts v. Davis Cnty.*, 551 F.3d 1188, 1195 (10th Cir. 2009) (citation omitted).  A plaintiff's burden in a constructive discharge case is "substantial." *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 805 (10th Cir. 2007).

According to her statement, Ms. Portillo left her job because she was afraid of being alone with Mr. Gaytan and because she had health concerns.[4]  Ms. Portillo's  fear of Mr. Gaytan was caused by the fact that she continued to have to work under Mr. Gaytan's supervision in a confined area, that there had not been an adequate investigation,[5] and no remedial action was taken against Mr. Gaytan.

---

[4] Ms. Portillo stated in an affidavit that she avoided being alone with Mr. Gaytan and that she left for additional "reasons related to my health and exposure to toxic gases"  Def.'s Ex. 13, **#42-14**, ¶ 17.

[5] The Court has some difficulty in accepting this factual premise when there is no evidence that Ms. Portillo was told that the investigation was concluded, what was done during the investigation, or the Hazards' conclusion.

18

Ms. Portillo relies on two opinions to demonstrate similar circumstances:  *Baker v. Echostar Commn's Corp*., Civil Action No. 06-cv-1103-PSF-BNB, 2007 WL 4287494 (D. Colo., Dec. 4, 2007), and *Martin v. Sears, Roebuck & Co.,* Civil Action No. 08-cv-01998-MSK-KMT, 2009 WL 4730466 (D. Colo., Dec. 7, 2009).  Although *Baker* and *Martin* share some factual similarity with Ms. Portillo's situation, they each show much greater cause for a reasonable employee to quit.

In *Baker*, harassment continued after the employee complained, the employee's job duties were reduced after her complaint, and the harasser targeted the plaintiff for additional abuse as a result of her complaint.  In contrast, Ms. Portillo suffered one incident, made a complaint and was told to stay away from Mr. Gaytan.  She left her employment without further incident.

In *Martin*, there was a physical assault by a supervisor.  The employee gave several reasons for leaving her employment – a belief that the employer had completed its investigation, a belief that the alleged harasser would receive no discipline, a belief that the discipline she received was unfair, and concern for her own safety because the alleged harasser would remain her supervisor.  Considered in the context of the employer's motion for summary judgment, the court construed the evidence most generously to the employee.  Pertinent was evidence that the employee had repeatedly inquired as to what efforts would be taken to ensure her safety, but that the employer offered only vague assurances and no specific protections,  thus leaving her with the belief that the employer's assurances were meaningless.  In contrast, Ms. Portillo's only conversations with management were in conjunction with her initial complaint.  There is no evidence that she was disciplined, that she requested safety measures, or that Spud Seller made

assurances to her that were not honored.  Indeed, her statement that she stayed away from Mr.

Gaytan suggests that she was able to continue performing her job.

Although it is understandable that Ms. Portillo felt fearful and uncomfortable around Mr.

Gaytan, her discomfort is not sufficient to establish an intolerable work environment.  *See, e.g.,*

*Chapman v. Carmike Cinemas,* 307 Fed. Appx. 164 (10th Cir. 2009).  On this record, the Court

cannot find that there has been an adequate showing that Ms. Portillo was constructively

discharged.  Therefore, Spud Seller is not subject to strict liability for Mr. Gaytan's actions.

**b.**     ***Faragher/Ellerth***

When an innocent employer takes reasonable care to prevent sexually harassing behavior

and an employee unreasonably fails to take advantage of the employers protections, the

employer cannot be held liable for its supervisory employee's bad conduct.  This is known as the

*Faragher/Ellerth* affirmative defense.  For it to apply, the employer must come forward with

evidence to establish two elements: (1) that the employer exercised reasonable care to prevent

and correct promptly any sexually harassing behavior, and (2) that the plaintiff employee

unreasonably failed to take advantage of any preventive or corrective opportunities provided by

the employer or to avoid harm otherwise.  *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765.

As to the first element,  the employer must show that it exercised reasonable care to prevent

sexual harassment <u>and</u> to correct promptly any harassment that occurred.  *Helm*, 656 F.3d at

1288.  Prevention may be shown by the existence of a sexual harassment policy[6] that is

---

[6] The EEOC provides guidance as to what constitutes a facially adequate sexual harassment policy.  It states that a policy should include at least the following elements:
> • A clear explanation of prohibited conduct;
> • Assurance that employees who make complaints of harassment or provide information related to such complaints will be protected

disseminated to employees.  *Id*.  Correction may be demonstrated by  showing that the employer

acted reasonably promptly in investigating or addressing a complaint of harassment.  *Id*. at 1290.

As to the second element, the employer must show that the victimized employee

unreasonably failed to take advantage of preventive or corrective opportunities or to avoid harm.

This may be satisfied by evidence that the employee did not use an employer's complaint

procedure or unreasonably delayed reporting incidents of harassment.  *Id.* at 1291; *Ellerth*, 524

U.S. at 765.  However, because the employer bears the burden of proof on this defense, summary

judgment cannot be entered if there is a dispute as to a material fact.

Spud Seller has presented evidence showing that it took measures to prevent sexual

harassment, including adopting and implementing a policy designed to prevent and address

sexual harassment, displaying a video to employees, and conducting periodic training of

employees.  All of the Complainants saw the video and signed statements acknowledging their

receipt of the employee Handbook that contained the policy.

---

against retaliation;
• A clearly described complaint process that provides accessible
avenues of complaint;
• Assurance that the employer will protect the confidentiality of
harassment complaints to the extent possible;
• A complaint process that provides a prompt, thorough, and
impartial investigation; and
• Assurance that the employer will take immediate and appropriate
corrective action when it determines that harassment has occurred.

EEOC Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by
Supervisors, Number 915.002, June 18, 1999, 1999 WL 33305874.  This guidance has been cited
with approval in *Anderson v. Wintco Inc*., 314 Fed.Appx. 135, 139 (10th Cir. 2009).

However, the issue is whether these efforts constituted "reasonable care" to prevent sexual harassment. As to that issue, the EEOC and Ms. Portillo have shown a genuine factual dispute.

First, the EEOC and Ms. Portillo raise a question as to whether Spud Seller adequately informed employees who spoke and read only Spanish about its anti-harassment policy. The Handbook that contained the policy was in English, and there is no evidence that its provisions were translated into Spanish or that written translations were supplied to Spanish speaking employees. There is evidence that the policy was "explained" in Spanish, but it is not clear what was actually explained. The video was presented in Spanish, but it did not purport to be a complete statement of the contents of the policy. Thus, there may have been a difference between the explanation of the policy and the policy itself.

Second, there is a question as to whether the policy itself was sufficient – both on its face in English, and as to whether it provided a meaningful remedy for Spanish speaking employees. It does not contain a provision that advises employees that they cannot be retaliated against if they complain of harassment or that their complaints will be kept confidential. Due to the makeup of the workforce, assuming that a Spanish speaking employee had a complaint, she could not bring it directly to the persons identified in the policy because they did not speak Spanish. Instead, she would have to supply her own interpreter or rely on another Spud Seller employee, which necessarily deprived her of confidentiality. Worse yet, the primary bilingual person who customarily explained the policy and interpreted for Spanish speakers was Mr. Gaytan. Indeed, there is evidence that could give rise to an inference that employees did not report the harassment because they had concerns about confidentiality or retaliation. *See, e.g.*,

Shane Gomez Dep., **#42-43** at 54 (did not report Mr. Gaytan's conduct because "I liked working there, and I didn't want to cause any problems").

As to whether Spud Seller took reasonable care to correct harassment, the factual disputes identified with regard to the negligence claim are applicable in this context.  Construing all of the disputed facts most favorably to the EEOC and Ms. Portillo, there is a lengthy history of inappropriate sexual behavior by Mr. Gaytan unabated by complaints and actions by Spud Seller.  A trial is required.

**B.  Other Complainants**

The procedural posture of this case is distinct.  Although the parties casually refer to the Complainants as members of a "class," it is not a class action.  Nor is it simply an action with numerous plaintiffs each pursuing single claims.  The EEOC has generally sought relief for other "aggrieved persons" and apparently advised Spud Seller of the identities of the women who it considers falling into that category.

As to "aggrieved persons," the EEOC need not plead any claim with particularity.  Only if it seeks individualized damages does it "stand in the shoes"of an aggrieved person in the sense that it must prove all of the elements of their sexual harassment claims.  *See, e.g., EEOC v. CRST Van Expedited, Inc.*, 2009 WL 2524402 ( N.D. Iowa, Aug. 13, 2009) (unpublished); *EEOC v. Carolls Corp.,* 2011 WL 817516 ( N.D.N.Y., Mar. 2, 2011) (unpublished).  From a technical perspective, the Complainants have no claims to be assessed in accordance with Fed. R. Civ. P. 56(a).  Their right to recover anything is derivative from the EEOC's success on its claim and its decision to seek damages on their behalf.

Because a trial is required on the claim brought by the EEOC, and its decision as to

whether to request individualized damages on behalf of any or all of the Complainants may change prior to trial, at this time and on a paper record, the Court declines to separately evaluate the sufficiency of evidence to establish individualized damage awards.

### C.      Punitive Damages

Punitive damages may be awarded under Title VII.  42 U.S.C. § 1981(b)(1) requires a showing that the employer engaged in discriminatory practices with malice or with reckless indifference to the employees' federally protected rights.  *Harsco Corp. v. Renner*, 475 F.3d 1179, 1189 (10th Cir. 2007).  Malice and reckless indifference can be shown by evidence that the employer "acted in the face of a perceived risk that its actions would violate federal law."  *Id*. However, where liability is vicarious, punitive damages cannot be awarded if the harasser's actions were contrary to the employer's good-faith effort to comply with Title VII.  *Id*. (citing *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 545-46 (1999)).  This is known as the *Kolstad* good-faith defense.

To avail itself of the *Kolstad* good-faith compliance standard, an employer must at least: (1) adopt anti-discrimination policies; (2) make a good faith effort to educate its employees about these policies and the statutory prohibitions; and (3) make good faith efforts to enforce an anti-discrimination policy.  *McInnis v. Fairfield Communities, Inc*., 458 F.3d 1129, 1138 (10th Cir. 2006).

The Court declines to grant summary judgment to Spud Seller as to the Plaintiffs' request for punitive damages for two reasons.  First, an award of  punitive damages is technically a remedy, rather than a claim or defense subject to Fed. R. Civ. P. 56(a).  The question of whether any damage award is appropriate is dependent upon whether the underlying claim for sexual

discrimination is established.  That is the issue to be tried.  Second, the disputed facts that underlie Ms. Portillo's negligence claim and the *Faragher/Ellerth* affirmative defense are also material to the *Kolstad* good-faith compliance standard.  All are appropriately left to fact finding by a jury at trial.

## CONCLUSION

Finding genuine disputes of material fact with regard to the claims of the EEOC and Plaintiff-Intervenor, Ms. Portillo a trial is required.  Spud Seller may assert the *Faragher/Ellerth* defense as to claims of vicarious liability.  Determination of the awardability of individualized damages to other aggrieved persons and punitive damages shall await trial.

**IT IS THEREFORE ORDERED** that Spud Seller's Motion for Summary Judgment is **DENIED**.  The parties shall contact chambers within seven days of the issuance of this order to set this matter for a Final Pretrial Conference.

Dated this 30th day of September, 2012

BY THE COURT:

Marcia S. Krieger
United States District Judge

25